UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Douglas A. Kelley,

                        Plaintiff,              Civ. No. 12-822 (RHK/LIB)

v.                                              **MEMORANDUM OPINION AND ORDER**

College of St. Benedict,

                        Defendant.

---

James A. Lodoen, Mark D. Larsen, Kirstin D. Kanski, Jeffrey D. Smith, Adam C. Ballinger, Lindquist & Vennum P.L.L.P., Minneapolis, Minnesota, for Plaintiff.

Jerome A. Miranowski, John B. Holland, Stephen M. Mertz, Megan S. Clinefelter, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Defendant.

---

"Ponzi schemes leave no true winners once the scheme collapses." Donell v. Kowell, 533 F.3d 762, 779 (9th Cir. 2008). At its core, this case asks the Court to decide between two "losers" in the lengthy Ponzi scheme orchestrated by Tom Petters. On one hand are the creditors of Petters and his now defunct companies, including the United States. On the other hand is the Defendant, the College of St. Benedict (the "College"), a small liberal-arts college in St. Joseph, Minnesota, that received $2 million in donations from Petters and entities he directed. Plaintiff Douglas Kelley, the Court-appointed receiver for Petters and entities he once controlled, brought this action to recover the donations under the Minnesota Fraudulent Transfer Act ("MFTA"), Minn. Stat. § 513.41 *et seq.*, and the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3001 *et seq.*

Kelley also asserts a claim for unjust enrichment. The College now moves to dismiss. For the reasons that follow, its Motion will be granted.

## BACKGROUND

Petters and others orchestrated and participated in a Ponzi scheme lasting over a decade. They laundered more than $40 billion through two companies Petters controlled, Petters Company, Inc. ("PCI") and Petters Group Worldwide, LLC ("PGW"), and other affiliated entities.

During the Ponzi scheme, Petters founded a non-profit corporation known as the Thomas J. Petters Family Foundation (the "Foundation"). Ponzi proceeds funded the Foundation, which was "merely a facade [and] provided a vehicle for Petters to display a false persona of wealth, success and altruism that allowed [him] to gain the additional credibility he required to induce more victims to invest money." (Am. Compl. ¶ 7.) On January 31, 2003, Petters pledged $3,000,000 to the College in return for it agreeing to name an auditorium after his parents. (Id. ¶ 38.) Over the next 2-1/2 years, he and the Foundation paid $2 million to the College under the pledge, all of which came from fraud proceeds. (Id. ¶¶ 38-44.) The remaining $1 million was never paid.

In late 2008, the FBI learned of the fraud and the Ponzi scheme imploded; Petters was arrested and later convicted of 20 counts of mail fraud, wire fraud, money laundering, and conspiracy. He is currently serving a 50-year prison sentence. Following his conviction, the Court entered a criminal forfeiture money judgment against him for more than $3.5 billion in fraud proceeds. (See Doc. No. 395 in Crim. No. 08-364.) That judgment remains outstanding.

Shortly after Petters was arrested, the United States filed an application under the fraud injunction statute, 18 U.S.C. § 1345, asking this Court to place Petters, PCI, PGW, and others into civil receivership. On October 6, 2008, the Court (Montgomery, J.) granted that application and appointed Kelley as the equity receiver for these individuals and companies, as well as the Foundation. He was granted the authority to "sue for, collect, receive, take in possession, hold, liquidate, or sell and manage all assets of these" individuals and entities. Kelley then placed PCI and PGW into bankruptcy and was appointed the trustee of their bankruptcy estates.

Meanwhile, the United States sought to forfeit certain assets previously held by Petters and others as part of the criminal proceedings against them. This resulted in substantial overlap in the property subject to the bankruptcy proceedings, the receivership action, and the government's forfeiture efforts. To avoid stepping on each other's toes, so to speak, Kelley and the government entered into a "Coordination Agreement" approved by both the Bankruptcy Court and Judge Montgomery. Under that agreement, the government would use its forfeiture powers to recover assets fraudulently transferred by the individuals to certain third parties. In return, Kelley would seek to recover from "religious, charitable, educational and/or political institutions" any "donations and gifts" made "on behalf of [Petters], [the] Foundation or other Receiver entities." (Def. Mem. Ex. B, § I(B)(3)(b).)[1]

---

[1] The Court may consider the Coordination Agreement when ruling on the instant Motion because it was referenced throughout the Amended Complaint. See Fed. R. Civ. P. 10(c); Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1063 n.3 (8th Cir. 2005).

The specter of such "clawback" litigation did not go unnoticed. Indeed, Kelley once publicly estimated that more than $400 million in charitable contributions by Petters and his associates were potentially subject to clawback. See http://www.startribune.com/politics/statelocal/146014325.html (last visited October 22, 2012). Apparently concerned that nonprofits, charities, religious organizations and the like would be unable to repay donations long after they had been received and spent, Minnesota's Governor signed legislation on April 3, 2012, redefining the term "transfer" under the MFTA. While claims under the statute were previously subject to a six-year statute of limitations, under the new definition a transfer "does not include a contribution of money . . . made to a qualified charitable or religious organization or entity unless the contribution was made *within two years of commencement of an action* under [the MFTA]." Minn. Stat. § 513.41(12) (emphasis added). This amendment applies to any "cause of action existing on, or arising on or after" its effective date, April 4, 2012 – that is, the amendment was retroactively applicable. 2012 Minn. Laws 151.

Acting "in his capacity as the court-appointed Receiver of Thomas Joseph Petters [and the] Thomas J. Petters Family Foundation" (Compl. at 1), Kelley commenced the instant action on April 2, 2012, two days before the MFTA amendment took effect. In his Complaint, Kelley asserted four fraudulent-transfer claims against the College, as well as a claim for unjust enrichment, and sought to set aside the pledge in its entirety and recover the $2 million the College had already received. The College moved to dismiss, arguing that the MFTA claims were untimely, based upon the statutory amendment above.

In response, Kelley filed an Amended Complaint that is the subject of the instant

Motion. The Amended Complaint asserts four claims under the FDCPA (Counts VI-IX), alleging that the pledge and the funds given to the College were fraudulent transfers. He also continues to assert four claims under the MFTA (Counts I-IV) and a claim for unjust enrichment (Count V). The College now moves to dismiss all of these claims. The Motion has been fully briefed, and the Court heard oral argument on October 4, 2012. The Motion is now ripe for disposition.

## STANDARD OF REVIEW

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 547. A "formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555; accord Iqbal, 556 U.S. at 678. Rather, the party seeking relief must set forth sufficient facts to "nudge[] the[] claim[] across the line from conceivable to plausible." Twombly, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [party] has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S at 556).

When reviewing a motion to dismiss, the Court "must accept a plaintiff's specific factual allegations as true but [need] not . . . accept . . . legal conclusions." Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556). The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the non-moving party.

Twombly, 550 U.S. at 554–56.   "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."   Iqbal, 556 U.S. at 679.

## ANALYSIS

**I.     The FDCPA claims (Counts VI-IX)**

The Court begins its analysis with the FDCPA claims, the crux of the instant Motion.   The College offers two reasons why these claims must be dismissed:   (1) Kelley lacks standing under the statute and (2) even if standing existed, the statute permits recovery only of "debts to the United States."   (Def. Mem. at 7-11; Reply at 3-14.)   As the standing argument is sufficient to dispose of these claims, the Court need not reach the second argument.

The College's standing argument actually comprises two separate but related contentions.   First, it asserts that a federal equity receiver enjoys standing only to bring claims on behalf of entities in receivership.   Second, it asserts that only the United States may bring claims under the FDCPA.   Because the FDCPA is reserved for the government's exclusive use, and because the government is not in receivership, the College argues that Kelley lacks standing to bring the FDCPA claims.   The Court agrees.

**A.     A receiver may sue only on behalf of receivership entities**

The College is correct that an equity receiver may sue only on behalf of the entity (or person) in receivership, not third parties.   This is because a receiver "stands in the shoes" of the receivership entity.   Lank v. N.Y. Stock Exch., 548 F.2d 61, 67 (2d Cir. 1977) (receiver "can assert only those claims which the corporation could have asserted");

accord, e.g., Marion v. TDI Inc., 591 F.3d 137, 147 (3rd Cir. 2010) (collecting cases holding that an "equity receiver may sue only to redress injuries to the entity in receivership"); Goodman v. FCC, 182 F.3d 987, 991-92 (D.C. Cir. 1999) ("[A] receiver has authority to bring a suit only if the entity in receivership could itself properly have brought the same action."). A federal equity receiver is akin to a bankruptcy trustee, e.g., Scholes v. Lehmann, 56 F.3d 750, 753 (7th Cir. 1995), a role that Kelley also happens to play in this case. That role requires him to maximize the receivership estates' assets for the *benefit* of creditors, including the United States,[2] but contrary to Kelley's assertion it does *not* give him standing to *sue* on their behalf. See, e.g., Javitch v. First Union Sec., Inc., 315 F.3d 619, 627 (6th Cir. 2003) ("[A]lthough the stated objective of a receivership may be to preserve the estate for the benefit of creditors, that does not equate to a grant of authority to pursue claims belonging to the creditors."); Goodman, 182 F.3d at 991 ("[N]othing . . . supports [the] expansive view of a receiver's authority to sue on behalf of . . . creditors of the company he represents."); Scholes, 56 F.3d at 753 ("[A] receiver does not have standing to sue on behalf of the creditors of the entity in receivership."); Hays v. Adam, 512 F. Supp. 2d 1330, 1341 (N.D. Ga. 2007) ("An equity receiver may sue only to redress injuries to the entity in receivership. . . . [I]t is clear that the receiver cannot bring claims directly on behalf of third-parties, [even though] those parties may nonetheless indirectly benefit from the receiver's actions as creditors of the receivership."). Presumably, this is why Kelley sued the College in his capacity as receiver and sought "to

---

[2] The United States is a creditor due to both the criminal forfeiture money judgment and unpaid tax liabilities by Petters and the other receivership individuals and entities.

recover [the] transfers and *preserve the property of the Receivership Individuals and the Family Foundation*." (Am. Compl. ¶ 10 (emphasis added).)

Kelley suggests that he enjoys standing because Judge Montgomery's Order appointing him receiver authorized him to sue on the government's (and other creditors') behalf. (Mem. in Opp'n at 3, 19 n.10.) He notes that the Order empowered him to commence actions not only for the receivership individuals and entities, but also for "other persons or entities whose interests" were held by them. He echoed this sentiment at oral argument, suggesting that the receivership Order "provide[d] a lot of broad powers" to him, including the power to sue on behalf of creditors. (10/4/12 Hear. Tr. at 26-27, 34.)

As the Court pointed out at the hearing, however, it is unclear whether Judge Montgomery intended her order to sweep this broadly. (See id. at 33-34.) More importantly, courts have rejected attempts by receivers to use appointment orders to create standing to sue on behalf of non-receivership entities. This is because "the appointment of a receiver is inherently limited by the jurisdictional constraints of Article III and all other curbs on federal court jurisdiction." Scholes v. Schroeder, 744 F. Supp. 1419, 1421 (N.D. Ill. 1990). Granting a receiver authority to bring claims held by others would violate those limitations, as "the ability to confer substantive legal rights that may create standing [under] Article III is vested in Congress and not the judiciary." Id. at 1421 n.6; accord, e.g., Liberte Capital Grp. v. Capwill, 248 F. App'x 650, 657-58 (6th Cir. 2007); Marwil v. Farah, No. 1:03-CV-0482, 2003 WL 23095657, at *5-6 (S.D. Ind. Dec. 11, 2003). As the Sixth Circuit noted in Liberte Capital, if "a district court could confer individual creditors' standing on a receiver simply by ordering it so, such an exception would completely

- 8 -

swallow the general rule that receivers may only sue on behalf of the entity they are appointed to represent, not on behalf of creditors . . . directly." 248 F. App'x at 664. Simply put, "in attempting to recover on behalf of [creditors], the Receiver purports to assert rights of third parties. . . . [T]he Receiver lacks standing to do so." In re Wiand, Civ. A. No. 8:05-1856, 2007 WL 963165, at *2 (M.D. Fla. Mar. 27, 2007).

Relying upon SEC v. Cook, No. CA 3:00-CV-272, 2001 WL 256172, at *2 (N.D. Tex. Mar. 8, 2001), Kelley also argues that although "the *general* rule is that a receiver may only bring actions that could have been brought by the entity in receivership, there are *certain situations* where the receiver is permitted to assert rights and defenses not available to the" receivership entity. (Mem. in Opp'n at 20 (emphases added).) But applying this principle here would cross a bridge too far.

Cook and Butcher v. Howard, 715 S.W.2d 601 (Tenn. Ct. App. 1986), upon which Cook relied, stand for the unremarkable proposition that, generally speaking, a receiver is subject to all defenses to which the receivership entity is subject. 2001 WL 256172, at *2. At common law, this made it difficult for a receiver to recover a fraudulent transfer by a corporation, since the corporation could not recover the transfer itself (as it was the wrongdoer) under the doctrine of *in pari delicto*. See, e.g., Lustgraaf v. Behrens, 619 F.3d 867, 885 (8th Cir. 2010) (noting that the doctrine precludes a plaintiff from recovery where "he participated in the alleged wrongdoing"). But when a receiver has been appointed for a corporation, the wrongdoer (the corporation) is removed from the picture and, hence, *in pari delicto* does not apply. See, e.g., Scholes, 56 F.3d at 754 ("[T]he defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated.").

- 9 -

A close reading of Cook reveals that this is what the court meant when stating that receivers may "assert rights and defenses not available to" the receivership entity. A receiver is not precluded from asserting claims that would be barred by a corporation's own fraud had the corporation brought the claims on its own behalf. 2001 WL 256172, at *2. Nothing in Cook alters the general rule that a receiver may sue only on behalf of the entity he represents.

### B.     Only the Government may invoke the FDCPA

The College also correctly argues that the provisions of the FDCPA are available only to the United States. The statute "was enacted, in part, to provide a uniform, nationwide mechanism" for the collection of *government* debts. United States v. Lawrence, 538 F. Supp. 2d 1188, 1193 (D.S.D. 2008); accord, e.g., Export-Import Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 116 (2d Cir. 2010); Pierce v. United States, 232 B.R. 333, 334 (E.D.N.C. 1999) ("The FDCPA was enacted to provide a more consistent means of debt collection for the United States and 'bring an end to the present situation whereby a crazy patchwork of laws in the fifty states dictate debt collection remedies available to [the government] in collecting Federal debts.'") (quoting H.R. Rep. No. 101-825, at 12 (1990)). It provides "the exclusive civil procedures *for the United States* to recover a judgment on a debt or to obtain, before judgment on a claim for a debt, a remedy in connection with such claim." 28 U.S.C. § 3001(a) (emphasis added). As the emphasized text suggests, non-government plaintiffs cannot invoke the statute. E.g., MC Asset Recovery, LLC v. Commerzbank AG, 441 B.R. 791, 804 (N.D. Tex. 2010) ("[T]he FDCPA is a remedy for the exclusive use of the United States."), vacated on other grounds,

675 F.3d 530 (5th Cir. 2012); <u>MC Asset Recovery, LLC v. So. Co.</u>, No. 1:06-CV-0417, 2008 WL 8832805, at *4 (N.D. Ga. July 7, 2008) ("[T]he FDCPA represents the exclusive civil procedures for the United States, *and no other entity*, to utilize in collecting its debts.") (emphasis added); <u>see also</u> <u>United States v. Elliott</u>, 149 F. App'x 489, 494 (7th Cir. 2005) ("The Federal Debt Collection Procedures Act . . . allows *the government* to collect a judgment owed to it.") (emphasis added); <u>United States v. Veal</u>, No. 04-0755-CV, 2005 WL 1532748, at *1 (W.D. Mo. June 28, 2005).

The FDCPA contains a bevy of other provisions intimating that only the United States may bring claims thereunder. For example, the subsection regarding service of process provides that "[a]t such time as counsel for *the United States* considers appropriate, . . . counsel for *the United States* shall exercise reasonable diligence to serve [] the debtor." 28 U.S.C. § 3004(c) (emphases added). Similarly, § 3012 authorizes *the United States* to join non-debtor defendants as parties. <u>See also</u> <u>id.</u> § 3104(b)(2) (listing matters "*the United States* shall include in its application for a writ of garnishment") (emphasis added); <u>id.</u> § 3205(b)(1) (same). Nothing in the statute contemplates that a non-government entity may invoke it. And notably, Kelley acknowledges that the "fraudulent transfer provisions within the FDCPA allow[] *the United States*, as a creditor, also to avoid navigating and complying with various fraudulent transfer laws adopted by the states." (Mem. in Opp'n at 13 n.9 (emphasis added).)

Kelley contends that courts have held "that a receiver may recover fraudulent transfers under the FDCPA on behalf of the United States." (Mem. in Opp'n at 15.) The Court's research, however, has failed to uncover any case so holding. The sole case

Kelley cites ostensibly supporting this proposition, Lightfoot v. Miss Lou Properties, Inc., Civ. No. 05-3776-PB-SS, 2006 WL 4029569 (E.D. La. Sept. 1, 2006), aff'd, 292 F. App'x 298 (5th Cir. 2008), is inapposite. There, the receiver was appointed *directly* under the FDCPA, which contains provisions for the appointment of receivers to collect debts owing to the federal government. Here, by contrast, Kelley was not appointed under the FDCPA to collect federal debts; the order appointing him makes no mention of government debts whatsoever. Rather, he was appointed under the fraud injunction statute, 18 U.S.C. § 1345, to assume control of the receivership estates and marshal their assets for the benefit of creditors.[3]

Kelley also argues that the government has "effectively assigned" its FDCPA claims to him under the Coordination Agreement. (Mem. in Opp'n at 21-22.) The word "assignment," however, is noticeably absent from the relevant portions of the agreement, and nothing therein suggests that the United States intended to assign its rights to him. The agreement simply provides that Kelley would bring claims "on behalf of the Individual Defendants, Thomas J. Petters Family Foundation or other Receiver entities," not on behalf of third-parties such as the federal government. While Kelley might be correct that "[n]othing *prevents* the United States from assigning or transferring its ability to pursue the

---

[3] Kelley also cites Bartholomew v. Avalon Capital Group, Inc., 828 F. Supp. 2d 1019 (D. Minn. 2009) (Davis, J.), but that case, too, does not aid his cause. There, the receiver was appointed by a *state* court under *state* law before the case was removed to this Court. Accordingly, state law controlled his right to sue (or be sued). Here, by contrast, Kelley was appointed by this Court, and *federal* law "govern[s] the capacity of a receiver appointed by a United States court to sue or be sued in a United States court." Fed. R. Civ. P. 17(b)(3)(B). The remaining cases Kelley cites in his brief, FTC v. National Business Consultants, Inc., 376 F.3d 317 (5th Cir. 2004), and NLRB v. EDP Medical Computer Systems, Inc., 6 F.3d 951 (2d Cir. 1993), did not address whether a receiver has standing under the FDCPA, but rather concerned whether certain obligations were "debts to the United States" under the statute.

remedies available to it under the FDCPA" (id. at 21 (emphasis added)), there is no indication that such an assignment occurred here. Notably, Kelley acknowledged at oral argument that there was no "direct assignment" in the Coordination Agreement, but he contended that an assignment was implicit in its terms. (10/4/12 Hear. Tr. at 18.) But the Court perceives no reason to read into the agreement something that simply isn't there – had the government intended to assign to Kelley its rights under the FDCPA, it could have (and should have) done so clearly and explicitly. The fact that it did not do so is telling.

### C.     The end result

Putting two and two together, the Court reaches the same conclusion as the College. Only the United States can bring FDCPA claims, and Kelley cannot sue on the United States' behalf because the government is not in receivership and has not assigned its rights to him. Accordingly, Kelley lacks standing to sue under the FDCPA, and Counts VI through IX must be dismissed.

## II.    The MFTA claims

There does not appear to be any dispute that the MFTA claims (Counts I-IV) are moot. Kelley acknowledges that these claims are not designed to recover the $2 million already paid to the College (as in the FDCPA claims). Rather, they seek to set aside the remaining $1 million of the pledge insofar as it can be construed "as an 'obligation'" – that is, were the College to attempt to recover the remaining funds. (Mem. in Opp'n at 7-8.) Yet, the College has indicated that it will not "attempt[] to enforce the Pledge in order to recover the remaining amounts that Petters promised to pay." (Reply at 14.)

In any event, the parties agree that the MFTA claims are relevant only to the College's defenses to the FDCPA claims.  (See Mem. in Opp'n at 7 n.6.)  As all of the FDCPA claims have been dismissed for the reasons noted above, the MFTA claims will also be dismissed.

**III.   The unjust-enrichment claim**

Kelley's final claim asserts that the College was unjustly enriched by the $2 million it received through the pledge.  The College argues that an equitable claim, such as unjust enrichment, cannot stand where "there is an adequate legal remedy or where statutory standards for recovery are set by the legislature."  (Reply at 15 (quoting Southtown Plumbing, Inc. v. Har-Ned Lumber Co., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992)).)  The Court agrees.[4]

In Southtown, the Minnesota Court of Appeals held that "[r]elief under the theory of unjust enrichment is not available where there is an adequate legal remedy."  493 N.W.2d at 140.  This is because when "a statute . . . provides a remedy by appeal or otherwise, such remedy is generally exclusive and will preclude any resort to equity."  Munshi v. J-I-T Servs., Inc., No. A06-346, 2007 WL 92852, at *2 (Minn. Ct. App. Jan. 16, 2007) (quoting Adelman v. Onischuk, 135 N.W.2d 670, 678 (Minn. 1965)).  Hence, "Minnesota courts repeatedly have held that the availability of statutory claims (whether state or federal) will preclude the assertion of an unjust-enrichment" claim.  Cummins Law

---

[4] This argument was not fully raised until the College filed its Reply brief, and hence the Court afforded Kelley the opportunity to submit a supplemental brief on this issue.  He declined, opting instead to rely upon the cases discussed at the hearing.  (See 10/4/12 Hear. Tr. at 16-17, 20-24, 27-28.)  Accordingly, the Court will address this argument.

Office, P.A. v. Norman Graphic Printing Co., 826 F. Supp. 2d 1127, 1132 (D. Minn. 2011) (Kyle, J.) (collecting cases).

The MFTA provided Kelley with an adequate legal remedy here. "In order for a legal remedy to be adequate it must be practical and efficient." Munshi, 2007 WL 92852, at *2. Kelley nowhere argues that is untrue of the MFTA, despite bearing the burden of doing so. Id. Moreover, it makes no difference that Kelley did not timely avail himself of the statute. See, e.g., Arena Dev. Grp., LLC v. Naegele Commc'ns, Inc., Civ. No. 06-2806, 2007 WL 2506431, at *11 (D. Minn. Aug. 30, 2007) (Montgomery, J.) (dismissing unjust-enrichment claim under Southtown despite plaintiffs' argument that "if their fraudulent transfer claims fail, they will not have an adequate remedy at law"); Munshi, 2007 WL 92852, at *2 (although a "remedy at law which is practically ineffective is not an adequate legal remedy," the mere fact that a plaintiff "fail[s] to pursue [an] available legal remedy [does] not entitle [him] to relief"); Mon-Ray, Inc. v. Granite Re, Inc., 677 N.W.2d 434, 440 (Minn. Ct. App. 2004); see also Drobnak v. Andersen Corp., 561 F.3d 778, 787 (8th Cir. 2009) (affirming dismissal of equitable claims because "plaintiffs *would have* had an adequate legal remedy . . . if they had adhered to the . . . Rule 9(b) pleading requirements") (emphasis added). Indeed, to conclude otherwise would permit Kelley to make an end-run around the recent amendments to the MFTA, which appear to have been designed to preclude precisely the types of claims brought in this case.

Kelley points out that several cases have permitted fraudulent-transfer claims and unjust-enrichment claims to coexist. (See 10/4/12 Hear. Tr. at 22-24.) This is perhaps not surprising, given that the Federal Rules of Civil Procedure allow for pleading claims in

the alternative.   See Fed. R. Civ. P. 8(d)(2)-(3).   But in any event, the Court has carefully reviewed the cases Kelley has cited,[5] and none appears to have been confronted with the argument made by the College here:   the availability of an adequate legal remedy precludes resort to unjust enrichment as a matter of law.   By contrast, the Court recently applied this principle in Cummins, and it perceives no reason to hold otherwise in this case. See also Bartholomew v. Avalon Capital Group, Inc., 828 F. Supp. 2d 1019, 1030 (D. Minn. 2009) (Davis, J.) (no unjust enrichment where receiver also brought claims under MFTA).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the College's Motion to Dismiss (Doc. No. 18) is **GRANTED** and Kelley's Amended Complaint (Doc. No. 13) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: October 26, 2012                                                         s/Richard H. Kyle
                                                                                                RICHARD H. KYLE
                                                                                                United States District Judge

---

[5] United States v. Bame, Civ. No. 11-62, 2012 WL 3544762 (D. Minn. Aug. 16, 2012) (Kyle, J.); Zayed v. Buysse, Civ. No. 11-1042, 2011 WL 2160276 (D. Minn. June 1, 2011) (Nelson, J.); Hecht v. Malvern Preparatory School, 716 F. Supp. 2d 395 (E.D. Pa. 2010); SEC v. Brown, 643 F. Supp. 2d 1077 (D. Minn. 2009) (Tunheim, J.); Kranz v. Koenig, 484 F. Supp. 2d 997 (D. Minn. 2007) (Magnuson, J.).